LEWIS *v*. TATE, MAYOR.

4-7996                                        195 S. W. 2d 640

Opinion delivered July 1, 1946.

*Creekmore & Robinson,* for appellant.

*Batchelor & Batchelor,* for appellee.

GRIFFIN SMITH, Chief Justice. The question is whether bonds Mulberry proposes to issue are valid: or, rather, whether matters of which complaint is made deprive municipal officials of power to execute the securities.

Mulberry was incorporated in 1880. October 2, 1945, its Council passed Ordinance No. 78, calling an election under Act 211 of 1939, the issue being whether the town should be advanced to a City of the Second Class. Notice was published in out-of-town newspapers, there being none in Mulberry. The Mayor also caused notices to be posted. November 6, 96 votes were cast in favor of the ordinance and none against it. A certified copy of the result was duly made, and on November 23, at a regular meeting of the Council, that body passed Ordinance No. 80, calling for a special election ". . . to submit to the voters the question of issuing bonds under Amendment No. 13 to the Constitution . . . for the purpose of constructing sewers." The complaint incident to this appeal recites that "The County Board of Election Commissioners appointed qualified electors of Mulberry as judges and clerks of the election, . . . held January

2, 1946." The vote was 103 for the issue, and none against it.

March 5, 1946, the Council unanimously passed Ordinance No. 86. It provides for an issue of $34,000 3¼% sewer *revenue* bonds, converted to $36,250 3% bonds.

Contention is:' (a) the Sheriff did not proclaim an election, as provided by § 4672 of Pope's Digest; (b) there was no reorganization of the city government after November 15, 1945, when the State Board of Municipal Corporations authorized the upgrading to a City of the Second Class, and prior to April 2, 1946, when new officers were elected, three wards were designated, and other municipal procedure consonant with the new status was taken; (c) requirements of Amendment No. 13 to the Constitution in respect of notice was not complied with, and (d) the City is proposing to issue two kinds of bonds for the same purpose.

The answer admits most of the material facts alleged; but insistence is that authority was appropriately exercised. On this final point the contention is that ". . . there is no Constitutional or statutory prohibition upon [the City's] right to issue bonds under Amendment No. 13 and [under] the provisions of Act 132 of 1933, as amended; that the bonds are separate issues and are payable from entirely separate funds, and there is nothing in either the Amendment or the statute which requires that either issue by itself be large enough to pay the entire cost of the sewer system."

The Court found that the answer stated defenses to the complaint. Appeal is from the Court's action in overruling a demurrer to the answer.

Our attention is first directed to Amendment No. 13 to the Constitution. It amends Art. XVI, § 1, of the Constitution of 1874. Cities of the First and Second Class are authorized to issue bonds for enumerated purposes, one of which is construction of sewers and comfort stations. In *Snodgrass* v. *Pocahontas,* 189 Ark. 819, 75 S. W. 2d 223, it was held that the Amendment did not pro-

hibit cities and towns from making improvements for which interest-bearing evidences of indebtedness might be issued, if the debt be payable solely from revenues derived from such improvement. In discussing the question Mr. Justice MEHAFFY said for the Court: "It was manifestly the intention of the framers of Amendment No. 13 to prohibit cities and towns from issuing interest-bearing evidences of indebtedness, to pay which the people would be taxed, or their property appropriated to pay the indebtedness, or any indebtedness that placed any burden on the taxpayers. (Citing *McCutchen* v. *Siloam Springs,* 185 Ark. 846, 49 S. W. 2d 1037.)"

It must be observed, however, that Amendment No. 13 only allows Cities of the First and Second Class to issue bonds payable from a tax not to exceed five mills; "towns," so-called, are not within the purview of the Amendment's exceptions. Preceding the proviso just referred to, the language is: ". . . nor shall any county, city, town or municipality ever issue any interest-bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the indebtedness existing at the time of the adoption of the Constitution of 1874."

The case turns upon power by the town authorities to authorize a millage tax. It is not necessary to discuss the want of a proclamation by the Sheriff. Assuming, without deciding, that appellee had the right to pledge surplus revenues to cover the issue of $34,000 converted bonds, (see *City of Harrison* v. *Braswell,* 209 Ark. 1094, 194 S. W. 2d 12)[1] still there was no authority for issuance of tax-secured bonds until Mulberry became a City of the Second Class. This status had not been acquired when the election was held, except to the extent that the serving officers were *de facto* officials with power to function regarding those things an Incorporated Town might do.

[1] The Chief Justice, and Mr. Justice McFADDIN, wrote separate dissenting opinions in the Harrison-Braswell case. While the dissents were noted in The Reporter, the opinions were not published, but appear in official report of this case, and will be printed in the 209th Arkansas Reports.

It is insisted that § 9494 of Pope's Digest confers the necessary authority. The section is taken from Act 212, approved March 23, 1915. The Act is curative. It deals with governments of municipalities "which the Legislature has declared to be Cities of the Second Class," and makes officers so serving the *de facto* officials of such governments. There is reference to the fact that some time must elapse before a government can be organized in such municipalities as incorporated towns, [therefore] the present officers of such municipalities are confirmed . . . and declared to be the *de facto* and *de jure* officers of said municipalities.

The next section requires the Governor to call special elections, "to be held in all municipalities which have been raised by Act of the General Assembly from the grade of Incorporated Towns to the grade of Cities of the Second Class."

Act 334, approved March 25, 1937, authorized "any incorporated town which is a county seat" to become a city of the second class by following the procedure outlined. The 1937 law was amended by Act 211, approved March 9, 1939. The requirement that the incorporated town be a county seat was eliminated. Prior to 1937 an incorporated town could not be advanced unless its population was in excess of 1,750. See Act 119, approved March 9, 1931; Pope's Digest, § 9483.

In *Cotten* v. *Hughes,* 125 Ark. 126, 187 S. W. 905, it was held that acts of municipal officers in creating a local improvement district and levying assessments (such acts having been performed subsequent to the passage of Act 212 of 1915, and before new municipal officers were elected) were valid. The opinion, however, carefully pointed out that ". . . creation of the improvement district was entirely within the statutory power of an Incorporated Town, as much so as within the powers of cities of either class, and the Legislature did not attempt to confer any new power in authorizing the Council to perform acts for and on behalf of the Incorporated Town."

*Board of Improvement of Gravette Waterworks Improvement District* v. *Carman,* 138 Ark. 339, 211 S. W. 170, is in point. In respect of Act 212 of 1915 it says: "This Act undertook to legalize the acts of *de facto* governments of . . . municipalities and to constitute the *de facto* governments the *de jure* governments until such time as an election could be held for the election of the officers provided for by law for Incorporated Towns." But § 2 of Act 212 required the Governor to, call special elections, and it was never contemplated that the *de facto* status should be unending.

The Carman case also held—as to the principle there presented: "We would have a very different question if there had been no legislative authority to create improvement districts in Incorporated Towns."

The Carman opinion says: "But [in the Cotten-Hughes case] we expressly pretermitted any discussion of the validating effect of [Act 212] on acts [of municipalities] which had been performed prior to its passage. That case is distinguishable from the instant case in this, that the improvement district, the organization of which was there upheld, was created by the Council of the town of Benton after the passage of Act 212 of 1915 and while the Council was acting under the authority there conferred by that Act as the Council of the Town of Benton. pending the election of their successors, which had not then been held; while here the improvement districts were established by aldermen who were assuming to act as aldermen of a City of the Second Class and prior to passage of the act."

Unless Act 212 of 1915 was intended as a bridge between incorporated towns and cities of the second class, the provisions of which should continue until altered by the General Assembly, there was no authority in the instant appeal for procedure under Amendment No. 13; but since an Incorporated Town may pledge a surplus the right to issue revenue bonds existed. This is the majority view, although the writer of this opinion, in dissenting in *City of Harrison* v. *Braswell, supra,* ex-

pressed the view (which he still entertains) that any pledge involving funds "in excess of the revenue for such City or Town for the current fiscal year" is void. See Amendment No. 10 to the Constitution.

The decree is reversed.

HOLT, J. (dissenting). With all due regard for the opinion of the majority, I am impelled to dissent.

The facts are not in dispute. By appropriate procedure, the incorporated town of Mulberry, Arkansas, was raised to a city of the second class and officially so declared to be by the State Board of Municipal Corporations on November 15, 1945. During the period between November 15, 1945, and April 2, 1946, on which latter date an election was held and municipal officers, for the second class city of Mulberry, were elected and took office, the municipal officers who were serving Mulberry, while it was an incorporated town, continued to hold over and function. It was during this interim, or hold over period, and, as indicated, after Mulberry had been raised to a city of the second class that the holdover officials of the city passed the ordinance giving to the electorate of Mulberry the opportunity to vote upon themselves the bond issues for the construction of the sewer system here in-

---

[2] The record in this case shows that $34,000 of 3¼% revenue bonds were authorized to be sold with privilege of conversion to 3% bonds. The record also discloses that when converted the amount would be $36,250. In a memorandum it is insisted that the municipality sold $34,000 of 3½% bonds, instead of 3¼%, with the privilege of conversion to 3%. The memorandum also shows that 3½% bonds so converted to 3% would correspond to an issue of $36,250, which amount would appear to be approximately correct. Seemingly, however, if 3¼% bonds were sold by the municipality (as reflected by the record) then approximately only $35,000 in principal of 3% bonds could be issued. Either the record is wrong as to the rate of interest to be borne by the bonds prior to conversion, or the conversion to $36,250 at 3% is wrong. Actually, if the municipality authorized the sale of $34,000 of 3½% bonds, then the conversion to $36,250 of 3% bonds, although not a true conversion, for all practical purposes would be correct. However, if 3¼% bonds were authorized, then the conversion to 3% would indicate an issue of approximately $35,000, if the computations here made are correct. The net result would seem to be that if 3½% bonds were authorized, the municipality should receive $34,000; but if 3¼% bonds were authorized, the excess, or over-issue, would be more than $1,000.

volved. The election was duly held and by an almost unanimous vote, the bond issues carried.

In these circumstances, the appellant contends and the majority opinion holds, as I construe it, that the acts of the holdover officers or city council of the town of Mulberry subsequent to November 15, 1945, when Mulberry was raised to a city of the second class, are absolutely void and of no effect in so far as their acts permitted the issuance of "tax secured bonds," and therefore, that any ordinance which these officials attempted to pass in order to permit the people of Mulberry to vote upon themselves tax secured bonds was of no effect, or invalid.

It is my view, both by present statute and former decisions of this court, authority is found for the acts of these holdover officers for the reason that they were acting at least in the capacity of *de facto* officers and while so acting, their acts in the circumstances were valid and binding. Section 9793, Pope's Digest, provides in part as follows: "The corporate authority of incorporated towns organized or to be organized for general purposes shall vest in one mayor, one recorder and five aldermen, who shall be qualified electors residing within the limits of the corporation, and shall hold their office for two years and until their successors are elected and qualified."

It is obvious that some time must elapse after the incorporated town of Mulberry was officially declared to be a city of the second class and the date on which municipal officers could be elected, and qualified and take office in Mulberry, as a city of the second class.

It seems to me that any other construction would mean that there would be an interim when Mulberry would be without any kind of government, and as this court said in *Board of Improvement of Gravette Waterworks Improvement District v. Carman,* 138 Ark. 339, 211 S. W. 170: "It is intolerable that there could be a period during which a governmental entity (referring to the incorporated town of Gravette) should be without a government."

I think that the old officers of the town of Mulberry held over and continued in office until their successors were elected and qualified as the statute seems to provide.

It must be noted here that what these holdover officers attempted to do was within the power of cities of the second class, under Amendment 13 of the Constitution of Arkansas, to perform. I think, as holdover officers, they had the same powers that would be accorded to officers duly elected and qualified after Mulberry became a city of the second class.

Here, there is no suggestion or intimation of fraud or lack of good faith on the part of these holdover officers. The people of Mulberry were given the opportunity by these officers to vote, and did vote these bond issues upon themselves. This small progressive city now operates and owns a waterworks system and I can conceive of no improvement that would be more effective in preserving and protecting the health and welfare of. the people within Mulberry than an adequate sewer system.

In *Faucette, Mayor,* v. *Gerlach,* 132 Ark. 58, 200 S. W. 279, Judge HART, speaking for this court, quoted with approval from Kent's Commentaries, 14 Ed., vol. 2, p. 295, and said: "In the case of public officers, who are such *de facto* acting under color of office by an election or appointment not strictly legal, or without having qualified themselves by the requisite tests, or by holding over after the period prescribed for a new appointment, as in the case of sheriffs, constables, etc.; their acts are held valid as respects the rights of third persons who have an interest in them, and as concerns ‚the public, in order to prevent a failure of justice."

Accordingly, it is my view the decree of the lower court should be in all things affirmed.

Mr. Justice McHANEY concurs in this dissent.